IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,658

In the Matter of LOUIS M. CLOTHIER,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed March 6, 2015. Three-year probation.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *Louis M. Clothier*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Louis M. Clothier, of Leavenworth, an attorney admitted to the practice of law in Kansas in 1981.

On July 10, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on July 17, 2014. The parties entered into written stipulations of facts. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on August 18, 2014, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.1 (2014 Kan. Ct. R. Annot. 456) (competence); 1.3 (2014 Kan. Ct. R. Annot. 475) (diligence); 1.4(a) (2014 Kan. Ct. R. Annot. 495) (communication with client); 3.5(c) (2014 Kan. Ct. R. Annot. 626) (communication with

1

a judge without delivering copy in writing to adverse counsel); 3.5(d) (engaging in undignified or discourteous conduct degrading to a tribunal); 8.2(a) (2014 Kan. Ct. R. Annot. 677) (statements about judges and legal officials); 8.4(d) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct prejudicial to the administration of justice); and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"DA11768

"9.      The respondent represented an active military service member in two cases:  a protection from abuse action and a divorce action. Debra Snider represented the wife in the two cases.

"10.      In January, 2013, outside a courtroom in the Leavenworth County District Courthouse, the respondent yelled at Ms. Snider. The respondent then explained that he was not upset with Ms. Snider, but was angry at another lawyer in a different case. The respondent explained to Ms. Snider that the moral of the story was 'don't fuck with me.'

"11.      Also in January, 2013, the respondent and Ms. Snider negotiated language in a proposed order trying to resolve issues in the divorce case. Ms. Snider believed that an agreement had been reached, but the respondent refused to sign the order. Thereafter, Ms. Snider filed an accusation in contempt against the respondent's client.

2

"12.     On February 4, 2013, the court conducted a hearing in the divorce case. During the hearing, the respondent stated to the court that Ms. Snider had not been honest with the court and made the following statement, 'I never thought I would have to report a fellow member of the bar to the ethics committee for being dishonest with the court.' Ms. Snider told the respondent to make a report in writing to the proper authority if he had a valid complaint. The respondent did not file a complaint against Ms. Snider.

"13.     On February 7, 2013, the court held a hearing on a motion filed by Ms. Snider. The respondent believed that he had not received proper notice of the hearing. The respondent went to Judge Wiley's chambers to complain about the notice. Ms. Snider arrived at Judge Wiley's chambers while the respondent was meeting with Judge Wiley.

"14.     As the respondent left Judge Wiley's chambers, the respondent approached Ms. Snider near Judge Wiley's administrative assistant's desk. The respondent handed Ms. Snider a piece of paper with proposed dates for the retrieval of Ms. Snider's client's personal property. Ms. Snider asked the respondent why he was willing to provide dates when just a few days before he was not willing to do so.

"15.     During the conversation, Ms. Snider 'rolled her eyes' at something the respondent said. The respondent became angry and called Ms. Snider a liar. The respondent stated that there was only one other lawyer in Leavenworth County that was more dishonest than Ms. Snider.

"16.     The respondent told Ms. Snider that she was nothing but a histrionic woman. During the conversation, the respondent raised his voice, he was very close to Ms. Snider, and he was jabbing at her with his finger. The respondent called Ms. Snider a 'newbie' as she has not been practicing very long in the Leavenworth area.

"17.     Ms. Snider feared that the respondent might attack her. Judge Wiley's administrative assistant also feared that the respondent might attack Ms. Snider. As the incident progressed, the respondent leaned very close to Ms. Snider and stated, 'why don't you just grow a pair and punch me.' Ms. Snider told the respondent that he should consider self-reporting his behavior to the disciplinary administrator.

3

"18. On May 15, 2012, K.B. retained the respondent to represent him in a divorce case and paid the respondent $2,500 for the representation. K.B. informed the respondent that he wanted to work out a property settlement agreement with his wife before the case was filed and his wife was served. K.B. and the respondent agreed that a settlement was not likely if the wife were served before the settlement was worked out.

"19. K.B. expected to be billed only for the initial consultation until K.B. instructed the respondent to proceed.

"20. Shortly after May 15, 2012, despite K.B.'s understanding, the respondent prepared divorce pleadings, including a petition and a request for temporary orders. K.B. had not authorized the respondent to prepare the pleadings.

"21. On October 15, 2012, K.B. went to the respondent's office without an appointment. At that time, he was ready to file his divorce. He advised the respondent of his new address and his desire to have to have the divorce completed before the holidays. Further, K.B. informed the respondent that he wanted to bring his wife to the respondent's office to pick up the pleadings rather than have her served.

"22. Despite K.B.'s instructions, on November 30, 2012, the respondent filed the divorce case in Leavenworth County District Court. The pleadings included a proposed stipulation and property settlement agreement. On December 6, 2012, the respondent sent a filed-stamped copy of the pleadings to K.B. and notified K.B. that a hearing had been scheduled for January 31, 2013.

"23. K.B. did not authorize the respondent to prepare the proposed stipulation and property settlement agreement. Further, K.B. did not agree with the contents of the property settlement agreement.

"24.    Despite K.B.'s express directions, the respondent made arrangements for K.B.'s wife to be served with the pleadings.

"25.    On December 14, 2012, K.B.'s wife filed an answer, counterclaim, and motion to modify the temporary orders. The court scheduled a hearing on the motion to modify the temporary orders for January 3, 2013. The respondent failed to provide K.B. with a copy of the answer, counterclaim, and motion to modify.

"26.    On December 19, 2012, the respondent sent K.B. a letter, enclosing copies of K.B.'s wife's discovery requests. Again, the respondent did not inform K.B. of the pending motion to modify or the hearing scheduled for January 3, 2013.

"27.    On December 20, 2012, the respondent's staff sent an email to K.B. requesting that K.B. stop by the office to pick up the discovery requests filed by K.B.'s wife. The packet of materials did not include a copy of the answer, counterclaim, or motion to modify. On December 21, 2012, K.B. picked up the packet of materials.

"28.    K.B. remained unaware that his wife had filed an answer, counterclaim, and motion to modify until December 31, 2012, when the respondent left a telephone message for K.B., informing K.B. of the hearing scheduled for January 3, 2013.

"29.    On January 1, 2013, K.B. called the respondent on the telephone. K.B. was upset that he was just finding out about the hearing scheduled for January 3, 2013. During the telephone conversation, the respondent 'went off' on K.B. The respondent told K.B. that K.B. would do what the respondent told him to do. The respondent called K.B. a 'son-of-a-bitch' and a 'motherfucker.' K.B. hung up on the respondent.

"30.    On January 2, 2013, at 12:16 a.m., the respondent sent K.B. a copy of the answer, counterclaim, and motion to modify as an attachment to an electronic mail message.

"31.    On January 2, 2013, Amy Coppola contacted the respondent and informed him that she was taking over the representation of K.B.

5

"32.     On August 7, 2013, the Honorable Dan Wiley, district court judge for Leavenworth County, filed a complaint against the respondent. In the complaint, Judge Wiley complained of a number of incidents where the respondent engaged in erratic behavior. The incidents occurred over a period of 3 years.

"33.     On one occasion, after Judge Wiley announced a decision from the bench which was adverse to the respondent's client, the respondent followed the judge to his chambers and stated, 'It's a good thing that you are still wearing that robe.' When Judge Wiley asked the respondent what he meant by that the respondent said, 'Why don't you take it off and step out here and I'll show you?' The respondent's tone was hostile and angry and Judge Wiley perceived these words as a threat.

"34.     On another occasion, the respondent confronted Clinton Lee, an attorney, in front of Judge Wiley's administrative assistant's desk. The respondent and Mr. Lee had a heated exchange about a case. The exchange ended when the respondent threatened to 'kick Mr. Lee's ass.' Judge Wiley's administrative assistant was frightened for her safety and the safety of Mr. Lee.

"35.     At a pre-trial conference, the respondent told opposing counsel to 'go jump in a lake.'

"36.     After receiving an adverse ruling in court, the respondent made the following statement to the judge, 'You are the poster child for judicial elections.' The statement was made at a time when there was a movement to alter the method by which judges are chosen in Leavenworth County.

"37.     During a hearing, the respondent stated, 'Be quiet kid, I am talking,' to a *pro se* litigant.

6

"38.    The respondent referred to opposing counsel, from another jurisdiction, as 'Mr. Out-of-Town attorney.'

"39.    On yet another occasion, the respondent admitted to Judge Wiley after a hearing at which he had lost his temper that he advised his client that 'he might go to jail but he was going to see how far he could push the judge.'

"40.    On May 29, 2013, during a hearing on an order to appear and show cause the respondent accused Judge Wiley of colluding with opposing counsel.

'MR. CLOTHIER:  . . .  We have significant problems with the Court's interpretation of what the Court said. Question whether the Court's read or listened to the tape. Otherwise, there's just—there's just too many obvious differences between my notes and the Court's recollection. And—it appears to pretty much, in every case, favor the motion that's been filed so we would ask the Court to recuse itself at this point in time because we believe your actions and the apparent collusion indicates some animus towards my client at this point in time. You can't tell a client to build me a Empire State Building in 3 months, your Honor, and—then deny you said what you said, and then us—, entertain a motion and issue an order for—to show cause when the Empire State Building is not built. It can't be done and your apparent collusion with opposing counsel in the case or animus toward my client is to the ext— is—to the extent that we think you should recuse yourself and allow someone with less emotional—apparently emotional—of feelings towards the case to resolve these issues.

. . . .

'MR. HALL:  Your Honor, I'm—just dumbfounded to have counsel allege that the Court—

'MR. CLOTHIER:  Objection, your Honor. The opinion—

7

'MR. HALL:  —and opposing counsel—

'MR. CLOTHIER:  —of counsel—of—respondent's counsel is irrelevant with regard to my actions. He can—and I would object to his—

'THE COURT:  All right.  Well,—

'MR. CLOTHIER:  I did not make any uh—, apparent indication or did not accuse him of collusion.

. . . .

'MR. CLOTHIER:  Your Honor, I would just make a comment that uh, that uh, figuratively, Mr. Hall put his arm around you and said you're a good judge. You just do whatever you think—you know, that—will help us. But go ahead, Judge, —

. . . .

'THE COURT:  You're coming dangerously close to impugning the Court at this moment. I'm not going to tolerate that.

'MR. CLOTHIER:  Your Honor, I've said what I've said. If you make—if you think that's the case, then you make the decision you got to make.

'THE COURT:  Well, what you're asserting is that there's collusion between Mr. Hall and me and the last comment about putting his arm around me or I need to read whatever—

'MR. CLOTHIER:  It's a figure of speech, your Honor.

8

'THE COURT:  —that you just state—

'MR. CLOTHIER:  I didn't—

'THE COURT:  And it's inappropriate.

'MR. CLOTHIER:  —impugn you.

'THE COURT:  Mr. Clothier, stop.

'MR. CLOTHIER:  I impugned him.

'THE COURT:  Stop. It's inappropriate. You're impugning
everybody.

'MR. CLOTHIER:  You may not like—

'THE COURT:  Stop.

'MR. CLOTHIER:  —what I say—

'THE COURT:  Stop. I'm talking now. I've let you guys say what
you wanted to say. I've listened to it. It is now my turn to talk. Stop. I
don't want to hear another word at this moment.  . . .'

"*Conclusions of Law*

"41.      The parties stipulated that the respondent violated KRPC 1.1, KRPC 1.3,
KRPC 1.4, KRPC 3.5(c), KRPC 3.5(d), KRPC 8.2(a), KRPC 8.4(d), and KRPC 8.4(g).
Accordingly, based on the parties' stipulation and the findings of fact above, the hearing
panel concludes that the respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC
3.5(c), KRPC 3.5(d), KRPC 8.2(a), KRPC 8.4(d), and KRPC 8.4(g), as detailed below.

9

## "KRPC 1.1

"42.     Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The respondent violated KRPC 1.1 by having K.B.'s wife served with divorce pleadings, despite his client's express directions. Accordingly, the hearing panel concludes that the Respondent violated KRPC 1.1.

## "KRPC 1.3

"43.     Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The Respondent failed to provide diligent representation to K.B. by failing to promptly notify K.B. that his estranged wife filed a motion to modify the temporary orders. Because the Respondent failed to act with reasonable diligence and promptness in representing his client, the hearing panel concludes that the Respondent (repeatedly) violated KRPC 1.3.

## "KRPC 1.4

"44.     KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, for a 6-month period of time, the respondent failed to keep K.B. informed regarding the status of the divorce proceedings, in violation of KRPC 1.4(a). Accordingly, the hearing panel concludes that the Respondent violated KRPC 1.4(a).

## "KRPC 3.5(c)

"45.     Under KRPC 3.5(c), a lawyer shall not:

'communicate or cause another to communicate as to the merits of a cause with a judge or official before whom an adversary proceeding is pending except:

> (1)     in the course of official proceedings in the cause;

> (2)     in writing, if the lawyer promptly delivers a copy of the writing to opposing counsel or to the adverse party if unrepresented;

> (3)     orally upon adequate notice to opposing counsel or the adverse party if unrepresented;

> (4)     as otherwise authorized by law or court rule.'

In this case, the respondent violated KRPC 3.5(c) when he communicated with Judge Wiley without proper notice to opposing counsel, regarding the notice of a motion to compel return of personal property. Thus, the hearing panel concludes that the respondent violated KRPC 3.5(c).

"KRPC 3.5(d)

"46.     'A lawyer shall not . . . engage in undignified or discourteous conduct degrading to a tribunal.' KRPC 3.5(d). In this case, the respondent engaged in undignified or discourteous conduct. First, the respondent engaged in undignified or discourteous conduct degrading to a tribunal when he stated to Judge Wiley that 'It's a good thing that you are still wearing that robe' and 'Why don't you take it off and step outside and I'll show you?' Further, the respondent violated KRPC 3.5(d) when he told Judge Wiley that Judge Wiley was 'poster child' for judicial elections. As a result, the hearing panel concludes that the respondent violated KRPC 3.5(d).

11

"47.    KRPC 8.2(a) provides:

'A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.'

The respondent made a statement that he knew to be false when he stated that Judge Wiley was in collusion with opposing counsel. As such, the hearing panel concludes that the respondent violated KRPC 8.2(a).

"KRPC 8.4(d)

"48.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the Respondent engaged in 'conduct that is prejudicial to the administration of justice' in relation to his conduct with Ms. Snider. The respondent accused Debra Snider of being dishonest. The respondent stated that Ms. Snider was 'nothing but a histrionic woman' and 'a newbie.' And, while in Judge Wiley's office, the respondent jabbed his finger at Ms. Snider and stated in a loud voice that Ms. Snider should 'grow a pair and punch' him. Additionally, the respondent engaged in conduct which was prejudicial to the administration of justice when he engaged in threatening conduct in the presence of Judge Wiley's administrative assistant, including when he threatened to kick Mr. Lee's 'ass.' Finally, the respondent engaged in conduct which was prejudicial to the administration of justice when he called opposing counsel, 'Mr. Out-of-Town Attorney,' when he told opposing counsel to 'go jump in the lake,' and when he told a *pro se* litigant 'Be quiet kid, I am talking.' As such, the hearing panel concludes that the Respondent violated KRPC 8.4(d).

"49.    'It is professional misconduct for a lawyer to . . .  engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). In this case, the respondent engaged in 'conduct that adversely reflects on the lawyer's fitness to practice law' when he called K.B. a 'son-of-a-bitch' and a 'motherfucker.' Further, the respondent violated KRPC 8.4(g) when he told his client that 'he might go to jail, but he was going to see how far he could push the judge.' Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(g).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"50.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"51.    *Duty Violated*.  The Respondent violated his duty to his client to provide competent and diligent representation. The respondent violated his duty to his client to provide reasonable communication. The respondent violated his duty to the public and the legal profession to maintain his personal integrity. Finally, the respondent violated his duty to the legal system to refrain from engaging in conduct that is prejudicial to the administration of justice.

"52.    *Mental State*.  The Respondent knowingly violated his duties.

"53.    *Injury*.  As a result of the Respondent's misconduct, the Respondent caused actual injury to his client, the legal profession, and the legal system.

13

"54.     *Aggravating or Mitigating Factors*.  Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"55.     *Prior Disciplinary Offenses*.  The respondent has been disciplined on two previous occasions. First, in 1994, the disciplinary administrator informally admonished the respondent for violating KRPC 8.4(b) and KRPC 8.4(g). Then, in 2010, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.9.

"56.     *A Pattern of Misconduct*.  The respondent engaged in a pattern of abusive behavior. The hearing panel concludes that the respondent's pattern of misconduct is an aggravating factor in this case.

"57.     *Multiple Offenses*.  The respondent violated eight violations of the Kansas Rules of Professional Conduct. Thus, the hearing panel concludes that the respondent committed multiple offenses.

"58.     *Substantial Experience in the Practice of Law*.  The respondent has substantial experience in the practice of law. The Kansas Supreme Court admitted the respondent to the practice of law in 1981. At the time of the misconduct, the respondent had been practicing law for more than 30 years.

"59.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"60.     *Absence of a Dishonest or Selfish Motive.*  The respondent's misconduct does not appear to have been motivated by dishonesty or selfishness.

"61.     *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.*  The respondent's mental health issues amount to emotional problems and the emotional problems contributed to a violation of the rules.

"62.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.*  The respondent cooperated during the hearing and fully and freely acknowledged his misconduct.

"63.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.*  The respondent has been an active and productive member of the bar of Leavenworth, Kansas. The respondent appears to enjoy the respect of his friends and peers and generally possesses a good character and reputation as evidenced by letters received by the hearing panel.

"64.     *Mental Disability or Chemical Dependency Including Alcoholism or Drug Abuse When (1) there is Medical Evidence that the Respondent is Affected by a Chemical Dependency or Mental Disability; (2) the Chemical Dependence or Mental Disability Caused the Misconduct; (3) the Respondent's Recovery from the Chemical Dependency or Mental Disability is Demonstrated by a Meaningful and Sustained Period of Successful Rehabilitation; and (4) the Recovery Arrested the Misconduct and Recurrence of that Misconduct is Unlikely.*  The respondent's mental disability is a mitigating factor in this case.

"65.     In May and June, 2013, Christy Blanchard, Ph.D., evaluated the respondent. She concluded that the respondent suffered from generalized anxiety disorder, depressive disorder not otherwise specified, attention deficit hyperactivity disorder not otherwise specified, and narcissistic personality disorder with obsessive compulsive personality disorder traits. Dr. Blanchard stated that the respondent's 'decision to seek inpatient treatment is an excellent first step toward effectively addressing his mental health issues.' Dr. Blanchard continued, '[c]onsistent with Dr.

Robertson's recommendations, individual therapy two to three times weekly is suggested upon his release to maintain his gains and further progress with his treatment goals.' Finally, Dr. Blanchard set forth minimum treatment goals for the respondent:

'1.     Identify and modify maladaptive thought patterns, especially those that encourage rigid, inflexible and unrealistic expectations of self and others.

'2.     Develop insight into etiology of anger issues as well as the disproportionate magnitude of his responses.

'3.     Increase self-awareness about how his behavior affects other people.

'4.     Develop and implement effective stress management strategies so that he can create and maintain a better balance between work responsibilities and his personal life. Within this goal, Mr. Clothier should identify and incorporate pleasurable leisure activities into his personal life.

'5.     Develop and implement effective emotional regulation skills, including but not limited to strategies that:

        a.     decrease anger and impulsivity;

        b.     manage anger appropriately when it emerges;

        c.     decrease overall worry and anxiety; and

        d.     mitigate depressive symptoms.

'6.     Given that Mr. Clothier's health appears to impact his mood and behavior, strategies should also be developed to help him

maintain his newly adopted healthy lifestyle that includes changes to diet, as recommended by his physician, and exercise.

'7.     Receive a psychotropic medication evaluation by a board certified psychiatrist and adhere to prescribed medication regime.'

"66.     In August, 2013, the respondent was admitted into an inpatient behavioral treatment facility, Pine Grove, in Mississippi, for a period of 90 days, for evaluation and treatment. Upon admission, the respondent was diagnosed with impulse control disorder, major depressive disorder, generalized anxiety disorder, and narcissistic personality traits. At the time of discharge, the respondent was diagnosed with bipolar I disorder, generalized anxiety disorder, impulse control disorder, narcissistic personality disorder with obsessive-compulsive traits, and antisocial traits.

"67.     While at Pine Grove and following his period of inpatient treatment, the respondent has made significant improvements in his behavior and his ability to control his anger.

"68.     After leaving Pine Grove, the respondent has worked with John M. Robertson, Ph.D. According to Dr. Robertson's July 29, 2014, report:

'Summary Statement.  Since his return from Mississippi, the behavior of Mr. Clothier has been monitored closely. The following observations can be made, based on my own observations in individual therapy sessions, statements to me from his other treaters, and reports from his family and his workplace.

'At this point in time, Mr. Clothier:

•     Has a more thorough understanding of the forces that have driven his maladaptive behavior over

17

the course of his life—their sources, origins, and expressions

• Recognizes more fully the impact his angry behavior has had on others in the workplace, and he has offered apologies to those he believes he has offended

• Can communicate openly about problematic issues in non-defensive ways

• Has strengthened his stress management skills

• Has developed emotional distress tolerance skills

• Can identify risk patterns early in their development

• Has ceased using alcohol completely, and is attending AA meetings regularly

• Has reported numerous interactions in which he has "caught himself" in the "about to" moment, just before he previously would have lost control of his language in professional settings—and he has responded more reflectively and less reactively as a result.

'Since 2003, I have observed between 900 and 1,000 professionals who were required to seek treatment because of their maladaptive behavior in the workplace (disruptive behavior,

unprofessional boundary crossings, inappropriate substance use, and behavior generated by various psychiatric conditions).

'Mr. Clothier is an example of how much difference a focused, intensive treatment program followed by a personalized aftercare plan can make in the life of a professional who is highly intelligent, motivated, and cooperative with his treaters.

'In the last 15 months, the "night and day" difference in his appearance, demeanor, and behavior is striking. He now listens. He accepts responsibility. He acknowledges risk. He is keen to observe the impact his behavior is having on others. Even his visage and mannerisms have changed, as he has become softer, more emotionally aware, more kindly, more empathic. Gone are the characteristic expressions of defiance, suspicion, dismissiveness, and accusatory anger.

'Mr. Clothier is a treatment success story, and the chances of his relapsing into behaviors like those that got him into difficulty appear to be minimal. With his aftercare supports in place, I believe he is fit to engage in the fulltime practice of law.'

"69.    In addition to his mental health issues, the respondent is also an alcoholic. The respondent has undergone treatment for his alcoholism. The respondent is subject to a monitoring agreement with the Kansas Lawyers' Assistance Program. The respondent is compliant with the program.

"70.    Based upon the evidence presented by the respondent, the hearing panel concludes that the respondent's mental disability is a mitigating factor. First, there is medical evidence that the respondent is affected by a mental disability. Next, the mental disability caused the misconduct. Third, the respondent's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation. Finally, the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

19

"71. *Remorse*. At the hearing on the formal complaint, the respondent expresses genuine remorse for his misconduct. At some point prior to the hearing, the respondent made heartfelt apologies to Ms. Snider and others affected by his misconduct.

"72. *Remoteness of Prior Offenses*. The 1994 informal admonition is remote in time to the misconduct in this case. The 2010 informal admonition is remote in character to the misconduct in this case.

"73. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'6.32 Suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding.

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"74. The disciplinary administrator recommended that the respondent be suspended for a period of 6 months. The disciplinary administrator also recommended that the respondent be required to undergo a hearing under Kan. Sup. Ct. R. 219 prior to consideration of reinstatement. The respondent recommended that his plan of probation be adopted and that he be allowed to continue to practice, subject to the terms and conditions of his proposed plan of probation.

"75.    Kan. Sup. Ct. R. 211(g) sets forth the procedure to follow when probation is requested:

'(1)    If the Respondent intends to request that the Respondent be placed on probation for violating the Kansas Rules of Professional Conduct or the Kansas Supreme Court Rules, the Respondent shall provide each member of the Hearing Panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least fourteen days prior to the hearing on the Formal Complaint. The plan of probation must contain adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court.

'(2)    If the Respondent provides each member of the Hearing Panel and the Disciplinary Administrator with a plan of probation, the Respondent shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan.

'(3)    The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

        (i)    the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

        (ii)   the Respondent puts the proposed plan of probation into effect prior to the hearing on the

21

> Formal Complaint by complying with each of
> the terms and conditions of the probation plan;
>
> (iii)    the misconduct can be corrected by probation;
>         and
>
> (iv)    placing the Respondent on probation is in the
>         best interests of the legal profession and the
>         citizens of the State of Kansas.'

"76.    The respondent developed a workable, substantial, and detailed plan of probation. The respondent provided a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel at least 14 days prior to the hearing on the formal complaint. The respondent put the proposed plan of probation into effect prior to the hearing on the formal complaint by complying with each of the terms and conditions of the probation plan. It appears that the misconduct can be corrected by probation.

"77.    The only remaining factor to consider is whether . . . probation is in the best interests of the legal profession and the citizens of the State of Kansas. The respondent has made remarkable progress in the past year. Dr. Robertson accurately characterized the respondent's change in his demeanor and in his interactions with others as 'night and day.'

"78.    Further, two district court judges were called to comment on the respondent's request for probation. The following exchanges occurred during the hearing:

> 'Q.    [By Chairman McInteer] . . .  Do you—as a judge who has had
>        Mr. Clothier appear before him since the treatment, do you
>        believe that probation would be an appropriate arrangement that
>        he could work under and still practice and it would work
>        appropriate in his case?

'A.      [By Judge Dan Wiley] Yes.

'Q.      [By Mr. Ambrosio] . . . Do you think that [the respondent] can operate with a practice supervisor like Mr. Bates?

'A.      [By Judge David J. King] Absolutely.

'Q.      Why?

'A.      I have no questions. Because [the respondent] is a different person. I think he's found some degree of peace, I think he's found some degree of insight in his own life. And I make that assumption because just the way he appears and the insight, the introspective qualities that I think that he has. I do know that Ron Bates would go to the last inch to help [the respondent]. I know that Tom Dawson I believe would go to the last inch to help [the respondent]. And I think that [the respondent] most importantly is in a position in his life now where it appears to me he will go to the last inch to help himself and that's the most important.'

"79.      Because of the respondent's significant rehabilitation, the hearing panel unanimously recommends that the Kansas Supreme Court grant the respondent's request for probation, under the terms set forth below:

1.      *Duration of Probation.* The respondent will remain on probation for 3 years from the date of the Supreme Court's opinion.

2.      *Supervision.* G. Ronald Bates will supervise the respondent's practice. As the respondent's practice supervisor, Mr. Bates will be afforded all immunities granted by Kan. Sup. Ct. R. 223.

23

a.    The respondent will allow the practice supervisor access to his client files, calendar, and trust account records.

b.    The respondent will comply with any requests made by the practice supervisor.

c.    The respondent will meet with the practice supervisor every week. During the regular meetings, the respondent and the practice supervisor will (1) discuss open cases, including cases which present any difficulties, (2) review the respondent's calendar for the upcoming two weeks for deadlines, court appearances, etc., and (3) review the respondent's trust account records.

d.    If, after 18 months, the practice supervisor concludes that meeting every week is not necessary, the practice supervisor may meet with the respondent on less frequent basis for the remaining probation period.

e.    The practice supervisor will provide written monthly reports to the disciplinary administrator. The monthly reports will detail the respondent's compliance with each of the terms and conditions of probation.

f.    If the practice supervisor discovers that the respondent violated the Kansas Rules of Professional Conduct or any term or condition of probation, the practice supervisor will

immediately report the violation to the
disciplinary administrator.

3.    *Law Office Organization.* The respondent will establish
and utilize a diary and docketing system which includes a mechanism by
which approaching court deadlines and statutes of limitations are noted.
The respondent will review each of his cases at least every 2 weeks to
determine what action needs to be taken. The respondent will update his
calendar on a daily basis.

4.    *Audits.* The practice supervisor will conduct audits of the
respondent's files every 6 months, beginning November 1, 2014, and
continuing throughout the time the respondent remains on probation. The
practice supervisor will make a report of each audit. In conducting the
audits, the practice supervisor will review each of the respondent's open
case files. In the report of the audit, the practice supervisor will
determine if deadlines were met, if the respondent maintained adequate
communication, and if there were any irregularities in the cases.
Additionally, the practice supervisor will note any matters which amount
to a violation of the Kansas Rules of Professional Conduct or the Rules
Relating to the Discipline of Attorneys. In the audit report, the practice
supervisor will also provide the respondent with a list of changes to
incorporate in his practice to improve the respondent's practice. The
practice supervisor will provide a copy of the audit report to the
respondent and the disciplinary administrator.

5.    *Court Deadlines.* The respondent will meet all deadlines
set by the courts or statutes. The respondent will appear in court for all
hearings scheduled on cases in which he is counsel of record.

6.    *Communication.* The respondent will return all
telephone calls from current clients within two business dates of receipt.

25

The respondent will respond to all written correspondence from current clients within one week.

7.    *KALAP Monitoring.*  Throughout the period of probation, the respondent will continue to be monitored through KALAP. The respondent will comply with all terms and conditions contained in the monitoring agreement. The respondent will keep his KALAP monitor informed of his treatment plan and the names of the treatment providers. Any deviation from the monitoring agreement shall be reported to the practice supervisor and the disciplinary administrator. The disciplinary administrator will exercise discretion in determining whether any deviation from the monitoring agreement amounts to a violation of the respondent's probation.

8.    *Log.*  The respondent shall maintain his log, referenced during the hearing on the formal complaint, current, throughout the period of probation. The respondent shall allow his KALAP monitor to review the log at any time during the period of probation.

9.    *Treatment.* The respondent will continue to comply with the treatment plan established by his treatment professionals by participating in counseling and by taking prescribed medications. The respondent will not discontinue his participation in counseling or discontinue taking his medication unless the treatment providers determine that counseling or medication is no longer warranted. A treatment provider will provide the practice supervisor, the disciplinary administrator, and the KALAP monitor with quarterly updates. The quarterly updates will include the respondent's compliance with the treatment plan, the respondent's progress in treatment, and the respondent's prognosis.

10.    *Releases.*  The respondent will execute releases necessary to allow his practice supervisor, KALAP monitor, KALAP

26

executive director, treatment professionals, and the disciplinary administrator, to freely discuss the respondent's status, progress, and cooperation with treatment and monitoring.

11. *Cooperation.* The respondent will attend any scheduled meetings with the disciplinary administrator. The respondent will provide information as requested by the disciplinary administrator.

12. *Additional Violations.* The respondent will comply with the Kansas Rules of Professional Conduct and the Rules Relating to the Discipline of Attorneys. If the respondent violates the Kansas Rules of Professional Conduct, the Rules Relating to the Discipline of Attorneys, or any term or condition of probation, during the period of probation, the respondent will immediately report the violation to the disciplinary administrator.

13. *Termination of Probation.* Under Kan. Sup. Ct. R. 211(g)(8), the respondent will remain on probation, even after 3 years' time, until the Supreme Court releases the respondent from probation.

"80. Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2014 Kan. Ct. R. Annot. 363). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the

truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing reports. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2014 Kan. Ct. R. Annot. 383).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct in violation of KRPC 1.1 (2014 Kan. Ct. R. Annot. 456) (competence); 1.3 (2014 Kan. Ct. R. Annot. 475) (diligence); 1.4(a) (2014 Kan. Ct. R. Annot. 495) (communication with client); 3.5(c) (2014 Kan. Ct. R. Annot. 626) (communication with a judge without delivering copy in writing to adverse counsel); 3.5(d) (engaging in undignified or discourteous conduct degrading to a tribunal); 8.2(a) (2014 Kan. Ct. R. Annot. 677) (statements about judges and legal officials); 8.4(d) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct prejudicial to the administration of justice); and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law), and it supports the panel's conclusions of law. We adopt the panel's conclusions.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator modified its recommendation that the respondent be suspended for a period of 6 months and undergo a hearing pursuant to Supreme Court Rule 219 prior to consideration of reinstatement. Instead, the Disciplinary Administrator joined the respondent's and the hearing panel's request that the submitted plan of probation be adopted and that respondent be allowed to continue to practice law subject to the terms and conditions of his proposed plan of probation under the terms set forth in its final hearing report.

28

This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). The court bases each disciplinary sanction on the specific facts and circumstances of the violations and aggravating and mitigating circumstances presented in the case. *Mintz*, 298 Kan. at 912. This court has taken the position that, while prior cases may have some bearing on the sanctions that the court elects to impose, those prior cases must give way to consideration of the unique circumstances that each individual case presents. *In re Busch*, 287 Kan. 80, 86-87, 194 P.3d 12 (2008). This court concerns itself less with the sanctions that were appropriate in other cases and more with which discipline is appropriate under the facts of the case before us. *In re Dennis*, 286 Kan. at 738.

In this case, the respondent developed a workable, substantial, and detailed plan of probation. The respondent put the proposed plan of probation into effect well in advance of the panel's hearing and has complied with its terms and conditions ever since. Further, the hearing panel concluded that the misconduct can be corrected by the proposed probation and that it is in the best interests of the legal profession and the citizens of Kansas to place the respondent on probation subject to the plan's strict terms and conditions. Finally, the Disciplinary Administrator, at oral argument before this court, recognized the extraordinary efforts made by the respondent in his recovery and fulfilling the requirements of probation by submitting a plan that provides for considerably more and stricter conditions than is required.

We agree with the parties' and the hearing panel's recommendation, and we hold that respondent shall be placed on probation, per Paragraph 79 of the hearing panel's final report. We find that the probation plan should be imposed with the modification that if the probation is revoked and a suspension invoked due to respondent's failure to comply

with the terms and conditions of the probation plan, he must have a reinstatement hearing pursuant to Supreme Court Rule 219 (2014 Kan. Ct. R. Annot. 415).

A minority of the court would impose a greater sanction of suspension.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Louis M. Clothier be and is hereby disciplined by imposition of the proposed probation plan for a period of 3 years in accordance with Supreme Court Rule 203(a)(5) (2014 Kan. Ct. R. Annot. 306).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

BILES J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 112,658 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.