IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN THE MATTER OF A MEMBER  §
OF THE BAR OF THE SUPREME  § No. 383, 2017
COURT OF THE STATE OF  §
DELAWARE:  § BPR Case Nos. 112751-B
 § and 113087-B
    JOSEPH A. HURLEY,  §
        Respondent.  §

Submitted:  January 10, 2018
Decided:  March 14, 2018

Before **STRINE**, Chief Justice; **VALIHURA, VAUGHN, SEITZ,** and **TRAYNOR**, Justices, constituting the Court *en banc*.

***PER CURIAM*:**

## O R D E R

This 14th day of March 2018, upon consideration of the Report and Recommendation of the Board on Professional Responsibility ("the Board") filed on September 20, 2017,[1] the Office of Disciplinary Counsel's ("the ODC") objections, and the response and reply thereto, it appears to the Court that:

(1)    The respondent, Joseph A. Hurley, was admitted to the Delaware Bar in 1970 and has practiced primarily as a criminal defense lawyer. In August 2016 and December 2016, the ODC filed two separate petitions for

---

[1] A copy of the Board's Report and Recommendation is attached to this Order as Exhibit A.

discipline against him. The first petition charged Hurley with one count of violating Rule 4.4(a)[2] of the Delaware Lawyers' Rules of Professional Conduct for making antagonistic, inflammatory and demeaning remarks to and about a former client in three separate letters sent to the ODC and his former client during the course of the ODC's investigation of a disciplinary complaint that the former client had filed against Hurley. The second petition charged Hurley with one count of violating Rule 4.4(a) and two counts of violating Rule 8.4(d)[3] for making disparaging or demeaning remarks to and about four different Deputy Attorneys General ("DAGs") in various correspondence to the DAGs and, in one instance, to the Superior Court during the course of Hurley's representation of several different clients.

(2) The Board held a consolidated hearing on the two petitions on March 28, 2017. As to Case No. 112751-B, the record reflects that the ODC received a complaint about Hurley from his former client in February 2016. The complaint raised two issues. The ODC wrote to Hurley and requested him to respond to the first issue only, which asserted that Hurley had interfered with the client's right to a speedy trial. Hurley responded by sending three

---

[2] Del. Lawyers' R. Prof. Cond. Rule 4.4(a) provides that, "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."

[3] Del. Lawyers' R. Prof. Cond. Rule 8.4(d) provides that, "It is professional misconduct for a lawyer to…engage in conduct that is prejudicial to the administration of justice[.]"

different letters to the ODC, copies of which were sent to his former client. The letters included material beyond the speedy trial issue and were sarcastic and insulting.[4]

(3)    In support of its complaint in Case No. 113087-B, the ODC presented testimony from multiple DAGs and former DAGs. The testimony established that, on several past occasions, senior DAGs had contacted Hurley about his inappropriate and unprofessional correspondence with junior, female DAGs. In 2007, the then-State Prosecutor wrote to Hurley and asked him to stop making personal, sexual or disparaging remarks to other DAGs. Hurley responded to that letter, sending copies to sixty-seven other DAGs, accusing the State Prosecutor of censorship. Hurley asserted that he had read the Rules of Professional Conduct and concluded that his brand of humorous correspondence was not unethical under the Rules.

(4)    Hurley also stated that, although he would maintain a professional relationship with the complaining DAG, he would continue to exercise his "constitutional right of free expression." Despite his promise to maintain a professional relationship with the complaining DAG, Hurley later sent her a copy of a letter in which he stated that he used to expose himself

---

[4] *See* Board's Report at 4-6.

"to girls using a popcorn box in a movie theater and while holding it in my lap and having my thing surrounded by popcorn."[5]

(5) The ODC also presented testimony from four other DAGs about more recent correspondence and interactions with Hurley, which led to the filing of the ODC's complaint. In one letter, Hurley suggested that the female DAG had no "brain wave activity." The letter included crude musings about the DAG's plans for Valentine's Day with her husband. In another letter, Hurley stated to a male DAG, "You are outmanned and outgunned. I am Catholic. You're not. You're a young Jewish man, I suspect." The letter went on to tell the DAG that he should be "a goat herder in Lebanon." In another letter to the same DAG, Hurley called him, "a certified asshole" and told him that if the DAG got "anybody to accept his [crackpot ideas] as Torah, then I will abide."

(6) Another DAG testified about several different emails Hurley had sent to her that included crude and sexualized comments, including one email that stated, "You are extraordinarily attractive! I'm sure that you stir the 'drums of passion' for all who see you today." In another email, Hurley called her "another beautiful, but arrogant female." A fourth DAG testified about an email from Hurley that referred to her as "Kurvacious" and "Kooky." In

---

[5] Board's Report at 12.

4

another instance, the DAG testified that Hurley sent an email to a Superior Court Commissioner, in response to the DAG's request for a continuance because of a teaching commitment, stating "beyond [yoga], I cannot fathom anything where she [the DAG] would have sufficient expertise to teach."

(7) After considering the evidence and the parties' post-hearing memoranda, the Board unanimously found that the ODC had proven three of its four counts by clear and convincing evidence. The Board concluded that Hurley's letters to and about his former client violated Rule 4.4(a) because the specific language in the letters demeaned his former client's mental state and personality and served "no substantial purpose other than to embarrass, delay or burden a third person."[6] The Board also concluded that Hurley's disparaging and demeaning correspondence to the four DAGs violated Rule 4.4(a). Finally, the Board concluded that Hurley's disparaging remark about opposing counsel in his correspondence to the Superior Court Commissioner was "prejudicial to the administration of justice" in violation of Rule 8.4(d).

(8) On the count that was found lacking, the Board concluded that Hurley's demeaning correspondence to the DAGs, which was only sent to them and was not copied to the court, was not "conduct prejudicial to the administration of justice" in violation of Rule 8.4(d). More particularly, the

---

[6] Del. Lawyers' R. Prof. Cond. Rule 4.4(a).

5

Board concluded that the correspondence was private and had no effect on any case and thus had no "direct impact on the administration of justice" because it did not burden the court.

(9)   In considering the appropriate sanction, the Board found that Standards 6.33[7] (public reprimand) and 7.2[8] (suspension) of the ABA Standards for Imposing Lawyer Sanctions were both relevant.[9]  Ultimately, the Board rejected the ODC's argument that Hurley's misconduct was knowing.  Instead, the Board found that Hurley had engaged in such ribald "humor" over the years and "had no conscious awareness that [such] conduct would violate the Rules."[10]  Thus, the Board concluded that Hurley's state of mind was merely negligent.  After weighing the aggravating and mitigating factors, the Board accepted the ODC's recommendation of a public reprimand with a requirement that Hurley pay for and complete a professionalism program approved by the ODC.

---

[7] Standard 6.33 states, "Reprimand is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system, and causes injury or potential injury to a party or interference or potential interference with the outcome of the legal proceeding."

[8] Standard 7.2 provides, "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system."

[9] Board's Report at 29.

[10] Board's Report at 30.

(10) In its objections to the Board's Report, the ODC contends that the Board erred in concluding that Hurley's demeaning correspondence to opposing counsel, which was not copied to the court, was not "prejudicial to the administration of justice" under Rule 8.4(d). The ODC also argues that the Board erred in finding that Hurley's state of mind was merely negligent, rather than knowing. The ODC does not object to the Board's recommended sanction.

(11) Hurley filed a "response" to the ODC's objections. In his response, Hurley claims that he did not read the ODC's objections. He purports to offer no substantive response other than to "accept responsibility as I must."[11]

(12) The ODC filed a reply, contending that Hurley's acceptance of responsibility and expressions of remorse are disingenuous, as evidenced by a 23-page document written by Hurley, entitled "My Struggle, also known as "Hurleygate."[12] Hurley apparently sent this document to many members of the Delaware Bar and Bench in May 2017, after the Board held its hearing in March but before the Board issued its Report in September. In that document, Hurley calls the ODC the "Office of Disciplinary Censorship," refers to the

---

[11] Response to Objections Filed by the Office of Disciplinary Counsel at 5.
[12] The ODC attached this document as Exhibit A to its reply memorandum on appeal.

disciplinary proceedings against him as an "attorney court-martial," and refers to the allegations of misconduct as "unfair and misdirected." He compared the Board's proceedings to "The Salem Witch (Warlock) Trial," referred to his disparaging remarks as "all in fun," and called the recipients of his demeaning comments "so-called victims." He also suggested that the ODC has "an enemies list" and acted against him simply because the ODC does not like him.

(13) The Court has carefully considered the parties' filings and the Board's Report. Although the Court finds the Board's recommendations helpful, we are not bound by them.[13] Because we have the inherent and exclusive authority to discipline members of the Delaware Bar,[14] we have an obligation to review the record independently and determine whether there is substantial evidence to support the Board's factual findings.[15] The Board's conclusions of law are subject to de novo review.[16]

(14) The ODC's first objection is that the Board erred in rejecting the fourth count of its complaint by interpreting "conduct prejudicial to the administration of justice" under Rule 8.4(d) too narrowly. The Board

---

[13] *Id.* at 720.
[14] *In re Nadel*, 82 A.3d 716, 719 (Del. 2013).
[15] *In re Abbott*, 925 A.2d 482, 484 (Del. 2007).
[16] *Id.*

8

concluded that Hurley's inappropriate emails to opposing counsel were not prejudicial to the administration of justice because they were "private" and did not directly burden the trial court or affect the outcome of pending litigation.

(15) We accept the Board's conclusion that the communications sent to opposing counsel did not violate Rule 8.4(d). Without question, the charged misconduct violated Rule 4.4(a) because the offensive portions of Hurley's unprofessional correspondence had "no substantial purpose other than to embarrass, delay or burden" opposing counsel. As to Rule 8.4(d), however, we accept the Board's conclusion, which was based upon the testimony of the DAGs, that the evidence did not clearly show that the letters, as offensive and inappropriate as they were, had an actual impact on the administration of justice. Our acceptance of the Board's conclusion on this point in this case should not be read as the adoption of a rule that such conduct, which is entirely unacceptable, could never support a Rule 8.4 violation upon a showing that the conduct affected the performance of opposing counsel or had some other distinct impact on the judicial process.

(16) The ODC's second argument is that the Board erred in concluding that Hurley's misconduct was not knowing but merely negligent. On this point, we agree with the ODC. "Knowing" misconduct may be

9

inferred from the circumstances of a given case.[17] In the disciplinary context, this Court has equated willful ignorance of the law as knowledge.[18]

(17) The ODC presented evidence that Hurley had been admonished on earlier occasions by senior DAGs about the inappropriate and offensive nature of his correspondence to more junior deputies in the office. Hurley, therefore, was on notice that his conduct was deemed offensive, which undermines the Board's finding that Hurley "did not act with a conscious awareness of the nature of the attendant circumstances"[19] and did not know that his conduct would violate the Rules. Hurley's excuse that his "arrogant and overbearing persona was known to all and appreciated by some"[20] does not transform—as Hurley seems to suggest—his patently offensive messages into acceptable attempts at humor. Simply put, Hurley may not have agreed that his unprofessional correspondence violated the Rules, but he should have known that it did. The record presented supports a finding of knowing misconduct.

(18) Even though we disagree with the Board's finding that Hurley's misconduct was merely negligent, we nonetheless accept the Board's

---

[17] Id.

[18] See In re Martin, 105 A.3d 967, 975 (Del. 2014); In re Nadel, 82 A.3d 716, 722 (Del. 2013).

[19] Board's Report at 30.

[20] ODC's Reply to Respondent's Response to Objections Filed by the Office of Disciplinary Counsel, Ex. A at 12.

recommendation of a public reprimand with conditions in this case. The ODC argued to the Board that Hurley's conduct was intentional, but it still recommended a public reprimand to the Board. The Board, having heard the testimony of the DAGs regarding the impact of the offensive communications and considering the course of communications between Hurley and the DAGs through the years, accepted the ODC's recommended sanction, and the ODC did not object to that recommendation in this Court Under the circumstances, although we would have considered and might have accepted a more severe sanction had one been recommended, we accept the Board's recommendation of a public reprimand with conditions.

NOW, THEREFORE, IT IS ORDERED that the Board's Report and Recommendation is ACCEPTED IN PART AND REJECTED IN PART. The Court hereby publicly reprimands Joseph A. Hurley and imposes the following conditions:

a) Hurley shall, within 6 months of the date of this Order, certify that he has successfully completed a training program to be provided by an experienced, qualified Human Resource professional, chosen by the ODC, on the subjects of professionalism, respectful treatment of colleagues and opposing counsel, and the need to refrain generally from inappropriate discussions of a sexual or religious nature when communicating, orally or in writing, in the course of practicing law;
b) Hurley shall pay the costs of the training program; and
c) Hurley shall pay the costs associated with the ODC's investigation of this matter.

# EXHIBIT A

EFiled: Sep 20 2017 10:53AM EDT
Filing ID 61138554
Case Number 383,2017

# BOARD ON PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF DELAWARE

Re:   Matter of a Member of the    :
      Bar of Supreme Court of      :
      Delaware                     :     Board Case Nos. 112751-B and
                                   :                    113087-B
                                   :
                                   :
Joseph A. Hurley,                  :
              Respondent           :

## BOARD REPORT AND RECOMMENDATION

This is the report of The Board on Professional Responsibility of the Supreme Court of the State of Delaware (the "Board") setting forth its findings and recommendations in the above captioned matter.

The members of the panel of the Board (the "Panel") are Deborah L. Miller, Ph.D., Jessica Zeldin, Esquire and Daniel F. Wolcott, Jr., Esquire (the "Chair"). The Office of Disciplinary Counsel (the "ODC") was represented by Jennifer-Kate Aaronson, Esquire and Kathleen M. Vavala, Esquire. The Respondent Joseph A. Hurley, Esquire appeared Pro Se.

A hearing was held on March 28, 2017. After receiving the transcript, the parties filed post hearing memorandum. ODC filed its opening memorandum on May 26, 2017, Respondent filed his memorandum on June 30, 2017 and ODC filed its reply on July 21, 2017.

1

I.    BOARD CASE NO: 112751-B

A.    Procedural Background

The ODC filed a Petition for Discipline on August 11, 2016. In that one count Petition, the ODC alleged a violation of the Delaware Lawyers' Rule of Professional Conduct (the "Rules") 4.4(a). Rule 4.4(a) provides "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden a third person...." On August 31, 2016, Respondent filed his answer to the Petition denying that he violated Rule 4.4(a).

B.    Findings of Fact

Respondent has been a member of the bar of the Supreme Court of Delaware since 1970. At all times relevant to the Petition, he was engaged in the private practice of law, primarily as a criminal defensive lawyer. Petition ¶1. Rock Peters was arrested for assault third degree and resisting arrest(Transcript 226[1]). He retained Respondent to defend him. Trial was scheduled several times in the Court of Common Pleas (Tr. 227). Respondent, as part of his trial strategy, decided to subpoena the New Castle County Police training manual shortly before trial so that the defense he planned would not be obvious to the prosecution (Tr.

---

[1] Reference is to the Transcript of the hearing before the Panel on March 28, 2017 (hereinafter, "Tr. __").

2

230). He therefore wanted to make sure the trial would proceed on the day it was scheduled. Respondent knew, given how the court schedules matters, that the trial scheduled for December 2015 would not occur. Mr. Peters wanted his trial promptly and, when the trial was continued from the December 2015 date, called Respondent in open court profane names (Tr. 229). Respondent determined at that time he would seek to withdraw as Mr. Peters counsel. He wrote Mr. Peters a letter explaining his position (Tr. 231). Shortly thereafter, Respondent received a letter dated February 25, 2016 (Ex. L)[2] from the ODC enclosing Mr. Peters' complaint (Tr. 231, 235). The complaint included two items: first, that the Respondent had denied Mr. Peters his right to a speedy trial and, second, that Mr. Peters claimed that he had met a former employee of Respondent who had resigned because Respondent demanded acts of sexual perversion from her (Tr. 231-32). The letter from ODC asked that Respondent confine his response to just the first issue. Respondent responded by sending ODC and Mr. Peters letters regarding the Complaint (Exs. M, N and O) that included material beyond the speedy trial issue.

Respondent explained the response was necessary for several reasons. First, he wanted to reply to the defamatory remarks and, second, that Respondent perceived Mr. Peters as a bully, who if unchecked, would assume that silence indicated acquiescence (Tr. 232). The letters included remarks regarding Mr.

---

[2] Exhibits A-X are documents admitted as Exhibits without objection.

3

Peters' mental status, conveyed in a sarcastic manner (Tr. 233-34). Portions of the

letters are as follows:

From the letter dated March 1, 2016 (Ex M):

> Although I am not required, indeed, it is not anticipated that I would response to your complaint, directly, I follow my policy of making another person aware when I criticize that person to a third party...

> I want to congratulate you on authoring the most invective-laden ODC complaint I have witnessed. It is somewhat amazing that because I did not do what you wanted me to do, even though it couldn't have happened had I performed as expected because of circumstances beyond my control, you have launched an attack while labeling me unethical, violating the attorney/client relationship (I kind of missed where I did that), nearly criminal and certainly deserving of disbarment because I didn't follow your instructions to say "We demand trial" To me, it seems kind of harsh to disbar someone for such a trivial matter.

> I would ask a favor of you. Whenever you next speak to your therapist (I assume you have a therapist) ask him whether or not your fusillade of words launched against me was a result of your perception of my rejecting you or simply your inability to accept anything but complete control of everything around you. Perhaps it was combination of both. I find that interesting.

> So that you don't embarrass yourself any more than you already have, I will tell you in your attempt to discredit me by giving contact information to a "victim" (?) of my "vile" sexual perversions you might want to know that the individual to which you refer did not "quit". She was fired!...

> Obviously you have your opinions and I seek not to change them because you are probably happy in viewing me as despicable as you can in order to vindicate yourself. I understand that because my previous potential career was clinical psychology. I simply tell you that you "shot yourself in the foot", by referencing that incident, and which, by the way, had nothing to do with the complaint, did it? Since it

4

already had been discredited and your reliance upon that adds to the discrediting of your complaint.

Your best chance of being successful in a criminal court situation was with me. Maybe you will find out the hard way. I could care less one way or the other what happens in your case, given this latest salvo, but I would like you to remember, in the event that you are found guilty, the words "What have I done?" as you pay the price.

Finally, and I will bother you no longer, please write down the list of miscalculations and misjudgments and deficiencies and insufficiencies that my case preparation contained as indicated by whatever attorney ultimately represents you. Most certainly, there should be many given the vibrant complaint you have filed.

...It is not my place to judge you nor, in case you haven't understood that, it's not your place to judge me. You have crossed the boundary and that is your prerogative as an individual. When you look in the mirror ask yourself how one who literally "grasped the beads of the Rosary" embraces the faith seeking the infusion of Godliness, acts in a manner that you have acted. Just a suggestion, but it certainly won't surprise me that you ignore any suggestion (Ex M) In a letter dated March 7, 2016 and sent to ODC copying Mr. Peters Respondent I make.

From the letter dated March 7, 2016 sent to the ODC and copying Mr. Peters

(Ex. N):

[(When informed of the new trial date)]...Peters was directed to sign a document acknowledging the requirement that he appear at the later date and.... Outside the presence of, myself, loud enough for at least two attorneys, who were situated probably four feet away from the spectator's gallery, to hear him utter a rather unpleasant characterization of me while describing me as a "F_ _ _ _ing A _ _ H_ _ _ _"! Both attorneys reported it to me and found the incident humorous.)

5

IMPAC 5395218v.1

From the letter dated March 11, 2016 also sent to ODC with a copy to Mr.

Peters (Ex O):

> [T]he System is "rigged" insofar as any person who is represented by an attorney has full license to bring a complaint against an attorney however meritless and an investigation results. I would suggest that American law schools have a course that is designated as "PUNCHING BAG 101."

> ODC never issues responses to baseless complaints that are critical of the complainant. At best, there is some kind of generic, neutral verbiage that announces that no action will be taken. Who defends the attorney? No one! Pity the poor attorney who has the bad luck to represent 20 "nutballs" and, therefore, has 20 complaints filed against him or her.
> . . .
> . . .I cannot tolerate the Rock Peters "of the world who simply "take shots" knowing there is no "downside" to their baseless complaints.

> Mr. Peters was adamant regarding having the trial scheduled promptly. He wasn't interested in a successful effort as much as he was a prompt resolution. Well, without seeming particularly strident, he got it! You will find enclosed an email from the prosecutor [(the email from the prosecutor advised Peters was convicted of Resisting Arrest)].
> . . .
> Had [Peters] concentrated his effort in cooperating with someone who knew what he was doing instead of deciding that he was the "boss of bosses", success may have occurred.
> . . .
> Although I know that I am subject to criticism for "telling it like it is", Mr. Peters got what he deserved and now he has to live with it because a very profitable civil lawsuit potential has just "gone down the drain."

> I am asking that this document be placed in the file and with the understanding that you are under no obligation to accommodate my wishes.

6

## II.    BOARD CASE NO. 113087-B

### A.    Procedural Background

On December 8, 2016, ODC filed its petition alleging in three counts Rule 4.4(a) and 8.4(d) violations based upon the contents of certain communications from Respondent to various Deputy Attorney Generals ("DAGs") and, in one instance, to the Superior Court. Respondent filed his amended answer to the Petition on December 27, 2016, generally denying that he violated Rule 4.4(a) or 8.4(d). There are four Deputy Attorney Generals involved in this matter. They have been denominated DAG 1F, DAG 2M, DAG 3F and DAG 4F.[3]

### B.    Findings of Fact

As mentioned above, Respondent has been a member of the bar of the Supreme Court of Delaware since 1970. At all times relevant to the Petition, he was engaged in the private practice of law, primarily as a criminal defense lawyer. Petition ¶1.

Over the years as a criminal defense counsel, Respondent has on many occasions, as part of his representation of his clients communicated, with the Department of Justice ("DOJ") DAGs prosecuting charges against his clients. In October 2007, then-State Prosecutor Richard G. Andrews requested that

---

[3]    In an effort to maintain confidentiality and with the concurrence of ODC and Respondent, the names of the Deputies are included as an attachment to the letter to William Montgomery forwarding this Report.

7

"Respondent refrain from making personal, lewd, sexual, religious, disparaging and/or demeaning remarks in correspondence to Deputy Attorney Generals assigned to criminal cases in which Respondent represented the Defendant." (Petition ¶2). In response, Respondent sent Mr. Andrews a letter dated October 25, 2007 objecting to what he termed censorship and indicated that he would continue exercising his "constitutional right of free expression no matter who likes it" (Petition ¶3; Ex. A). Prior to the October 2007 exchange, Mr. Andrews had communicated with Respondent by telephone with Paul Wallace, who was then with the DOJ and in charge of New Castle County prosecutors (Tr. 63), concerning a complaint from a prosecutor about a remark Respondent had made about her appearance. Mr. Andrews left the DOJ for the federal bench in November 2007 (Tr. 58). From October 2007 to his departure from the DOJ, Mr. Andrews does not remember any other incidents involving Respondent (Tr. 66). Mr. Wallace recalled no other complaints about Respondent between 2007 and when he left the DOJ for the Superior Court in 2013 (Tr. 56).

**DAG 1F**

DAG 1F became a member of the Bar in 2003, beginning work in private practice. In 2005, she became a Deputy Attorney General assigned to the criminal division in New Castle County. She left in February 2017 (Tr. 92). DAG 1F worked on cases with Respondent throughout her career at the DOJ and believed

8

she had a good rapport with him (Tr. 93-4). While she did not generally socialize with Respondent, she and her husband attended an event at Respondent's house with other prosecutors and judges (Tr. 96). Over the course of years, she engaged in humorous bantering with Respondent, all a part of the collegiality and gallows humor of the practice of criminal law (Tr. 96-7; Tr. 42-4 (Testimony of Paul Wallace)).

DAG 1F had been the recipient of some of the communications that culminated in the exchange between Respondent and Mr. Andrews (Ex. A; Tr. 98-9).

On February 14, 2012, Respondent wrote to DAG 1F regarding a criminal case in which Respondent represented the defendant (Ex. B). Portions of the text follows:

### CERTIFICATION[4]

We, anonymous, have successfully hacked into the brain of [DAG 1F] and do certify that the enclosure represents the brain wave activity intercepted on February 14, 2012.

Here it is Valentine Day already. I sure want to make some plans for that, but I have to analyze this Haughton matter and put it to rest. Joe Hurley is lecturing me, and I want to shut his mouth for once and for all. Hmmm! Let me think.

---

[4] Exhibit B, Page 1 includes the word "Certification" and the first paragraph quoted above. Following the brain wave activity paragraph, the rest of the page (purporting to be the intercepted brain waves) is blank. The balance of the quoted language are excerpts from Exhibit B, pp. 2-4.

9

Oh, I remember. Hmmm! This is going to be our first Valentine's Day together after the baby. I wonder if it'll be the same? Will the same excitement be there? Will the same anticipated eagerness be there? I wonder. I know I have seen on many occasions where it "gets old" with others. I'm not going to let that happened to me. I guess I better stop by Victoria's Secret after work and get something to wear for when he comes home tonight. I want to push up and push in. I'll find something. That'll do it. Those 5-inch heels that he loves so much and new lingerie . . . – oh, back to Haughton.

Joe Hurley says he's not really involved in drug dealing. Yeah, where have I heard that before? Is anyone going to admit it? Well, let me figure it out on my own. [Nickname for DAG 1F] girl you got a pretty sharp mind, yeah, that's me "sharp and curvy" so I will put it all together.

. . . He used his cell phone to make his call to get this stuff, and he used his cell phone to communicate with Smith. That's where the evidence will be. If he's been involved in this shit, there are going to be text messages indicating that, and his cell phone records will lead to contacts with other people who are on the police intelligence list as drug persons. That's where I'll look. [Nickname for DAG 1F], you are one....

Okay, here's what I'm going to do. He is going to have to plead guilty to a felony, and he's going to have to agree to Level 4 followed by Level 3 and he's going to have to perform 250 hours of community service and I'm going to require Joe Hurley to draft up an acknowledgement that Haughton will sign that will indicate that he believes that if he should ever again be convicted of a drug felony, he should serve the rest of his life in a penitentiary. I want to make sure that he doesn't come back here with something like this again.

....Aah, back to reality – I hear him at the door. "Honey, I'm in the bedroom – WAITING."

DAG 1F was "offended" by the memo and she did not find any portion of it funny (Tr. 99, 102). She interpreted the blank brain wave portion of the communication as "Mr. Hurley was calling me an idiot, basically" (Tr. 101). DAG

10

1F testified that the other aspects of the communication were "insulting" and "derogatory" (Tr. 104). Specifically, the sexual topics discussed in the memo were personal, none of which had been discussed between DAG 1F and Respondent. She testified that she had received other letters from Respondent in the past but that this one had particularly upset her (Tr. 105).

After a recess at a calendar call in the Courthouse, DAG 1F returned to the courtroom and walked past Respondent who was sitting at a table who then tapped his lap and said to DAG 1F "here, you can come sit on my lap." DAG 1F told him to "Knock it off" (Tr. 109). There were other emails and correspondence that are part of the record (contained within Respondent's notebook filed with his June 30, 2017 memorandum) in which Respondent would reference purchasing shoes and other items. DAG 1F said those emails did not bother her. (Tr. 110-11).

When asked if she ever requested that she not be assigned to cases in which Respondent was involved, DAG 1F indicated she had not and did not know of anyone who had. Such an arrangement would have been difficult because Respondent was in the Courthouse nearly every day and had numerous cases. In addition, she thought other counsel would think poorly of anyone who requested such a reassignment (Tr. 114-15).

11

During the hearing and after DAG 1F's testimony, Respondent indicated he wanted to change his plea to admit that the February 14, 2012 memo (Ex. B) violated Rule 4.4(a) (Tr. 112, 115).

**DAG 2M**

DAG 2M was employed at the DOJ in 2012 shortly after he passed the Delaware Bar Exam. He started in the misdemeanor trial unit, proceeded to the New Castle County Felony Trial Unit and then to the Wilmington Felony Trial Unit (Tr. 138). His personal interactions with Respondent had always been cordial but he received correspondence on April 15, 2014 concerning a case from Respondent, which DAG 2M felt was offensive (Tr. 138-39; Ex. C). A portion of the email follows:

> So, now we're going to try to persuade with logic? You are outmanned and outgunned. I am Catholic. You're not. You're a young Jewish man I suspect. You have not studied the teachings of St. Thomas Aquinas. You probably never even read any of the works of Al Jolson.
>
> St. Thomas Aquinas was able to convince Catholic boys that masturbating would cause you to have a mortal sin, and you would burn in hell for eternity. Get that? One act of masturbation equals infinity in hell. Hey, [DAG 2M] and Tom Aquinas have something in common regarding the concepts of punishment. Now let's see what they don't have in common regarding logic. You have a big gaping hole in your logic(?).
>
> You say that if he had already been convicted of his third and then got his fourth he would have gotten nine months. True. You miss the point. If he had gotten his third, and pulled 90 days in prison, there never would have been a fourth. That is the logic of the illogical proposition you have put forth.

12

I'm not going to try to twist your arm because if you can't see that losing one's livelihood to some poor schmuck like John Dillmore is losing everything, then you ought to be a goat herder in Lebanon. It's a pretty big punishment Jack. How about if I get your ass fired by telling Beau that you're an insurrectionist, and you can't get a job.

Asked to delineate those areas he found inappropriate, offensive or insulting, he noted the comments about his religion, which is Jewish, the reference to masturbation, and threats to having him fired (Tr. 140-41). With respect to being fired, DAG 2M was a new Deputy and did not know if Respondent had sufficient influence to follow through (Tr. 143). DAG 2M sent the email to his supervisor (Tr. 146).

DAG 2M also testified about another email he received on March 11, 2015 (Ex. D). The email follows:

You are a certified asshole! Failure to respond in a contradictory fashion, within three days, 'will be taken as your acknowledgement that you are an asshole'!

I am offering this in the same spirit that you, sort of like a King or something, simply dictate in your discovery letter that if I don't 'jump through the hoop' and affirmatively advise you that you screwed up, then, somehow, I screwed up. It don't work that way Jack.

Go check Rule 16 and you will see that a defense attorney 'may' pose an objection. Where do you get these crackpot ideas? Why don't you go write the [last name of DAG 2M] Rules and include that one? If you get anybody to accept them as 'Torah', then I will abide.

13

He objected to the reference to his religion and Respondent calling him an "asshole" (Tr. 147). The Deputy testified that he was surprised to receive the email since the language referenced was unprofessional (Tr. 147).

At the conclusion of DAG 2M's testimony Respondent changed his response to the Rule 4.4(a) allegation admitting a violation (Tr. 149). He apologized for making him feel uncomfortable, indicating that it was not intended (Tr. 156).

**DAG 3F**

DAG 3F was admitted to the Bar of Delaware in 2012 and began work with the DOJ in 2013 (Tr. 158). She knew Respondent was an excellent lawyer, could be pretty funny and she thought they had a professional working relationship and "got along...great" (Tr. 159). Respondent sent DAG 3F emails that she thought were funny and to which she took no offense (Tr. 162). She, however, was uncomfortable with a reference to her body in an email dated January 8, 2016 to a male Deputy involving a case with which she was not involved (Ex. E; Tr. 163-64). A portion of the email follows:

> ... I will tell you, there is a lady with long black hair whose last name begins with [the first letter DAG 3F's last name] ... who has 'edges' that you can never duplicate!

On February 29, 2016, she received an email from Respondent concerning a case they had together (Ex. F). A portion of the email follows:

> I have considered what could be if I were 20 years younger and, indeed, I accept the fact, and a fact it is, with a difficult departure from my

14

typical modesty and humility, that you would view me as a "hunky" (a word from the past, no doubt) distinguished "older gentleman" most worthy of your flirtations. Fate has dealt another hand and, instead, I can be viewed as a bungling, arrogant dinosaur struggling to exist in a new culture filled with robots, walking dead and super sensitive people who want to be called 'victim'...

The remark that you made, in e-mail of course since we humans communicate with out fingertips, and an occasional thumb, I imagine, rather than our tongues, and I wonder what labor our tongues can now accomplish since their raison e'tre has been removed. [Joe, shut up!]. (Okay, well, okay.)

While Exhibit F is one page there are two additional pages that appear as part of Exhibit T as "Exhibit A" towards the end of Exhibit T. Exhibit T was a letter to the General Assembly. While Exhibit A appears in Exhibit T Respondent testified that it did not go in the letter to the General Assembly (Tr. 297).

DAG 3F testified to the sexual connotations in Exhibit F (as supplemented) and while she "brushed" it off (Tr. 168) or "breezed over it" (Tr. 170) her reaction was to think it was outrageous (Tr. 172). She also received an email from Respondent dated July 11, 2016 (Ex. G) that contained a comment about "drums of passion," which again she thought was outrageous (Tr. 170-72). A portion of the email follows:

Let me begin by stating the obvious. You are extraordinarily attractive! I'm sure that you stir the "drums of passion" for all who see you today.

Finally, DAG 3F received a memo dated July 25, 2016 from Respondent (Ex. H) that referred to her religion and ethnic background. There was a reference to an

15

arrogant Greek female and additional comments on her appearance all of which made her uncomfortable (Tr. 174). A portion of the email follows:

> Probably I'm crazy, (Should I stop here?), but I remember a conversation that we had with Judge Cooch and during the course of which you voiced your concern that the dreaded "C" word was contained in Jerel's records. I remember something along the lines of that requiring expert testimony or something like that. If I am correct (I usually am), then you have forgotten your understanding of the rule of law (it was wrong), or, alternatively, you're just another beautiful, but arrogant, Greek female, who has one set of rules for her and another set for the rest of us including, particularly, the Scotch Irish male.

DAG 3F during a trial made a special comment on her trial notes regarding something Respondent said in Court. The victim was testifying and referred to the area where DAG 3F was sitting in the Courtroom and Respondent identifying the location referred to her as "This pretty lady here" (Tr. 177; Ex. U at page 168).

DAG 3F indicated that in general the banter with Respondent was not offensive but the cumulative effect and the letter to the General Assembly (Ex. T), in which she felt she was identified, upset her to "[her] core" (Tr. 180).

**DAG 4F**

DAG 4F began working at the DOJ in 2008. She encountered the Respondent in that time frame. They had a very good professional relationship and a certain rapport (Tr. 119). In April 2016, she received a memo from Respondent in which he referred to her as "KKK" (not her actual initials) translating those initials to sexual comments about her looks or mental state (Ex. I; Tr. 124). She

16

did not appreciate the use of "KKK" for its racist overtones and did not think even a joke about it was funny (Tr. 125).

In June 2016, DAG 4F was teaching a class at the Police Academy that conflicted with a motion hearing scheduled in Superior Court. DAG 4F sent an email to Commissioner Manning, the presiding jurist, explaining the scheduling issue and explaining that she was teaching a class. Respondent replied in writing to the Court (Ex 3):

> Commission Manning, before I take a position with regard to the request, I am most curious at what class [DAG 4F] is capable of teaching. I presume it is 'Yoga' and, if I am correct, Yoga is important for health, and I do not object. Beyond that, I cannot fathom anything where she would have sufficient expertise to teach.

While DAG 4F testified that she might ordinarily think the email was humorous, she viewed the language as suggesting she was "completely incompetent" and was concerned because that language was now before the Court and of public record (Tr. 129-30). Even if Commissioner Manning thought the comment humorous, there may be others who would see the file and, not knowing DAF 4F, may think she was incompetent (*id.*). It made her feel very uncomfortable (Tr. 130, 133).

III.  RULE 4.4(a) ANAYLSIS AS TO BOTH CASES

Rule 4.4(a) provides that "in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden a person." With regard to all the communication to the DAGs and the Court, the

17

IMPAC 5395218v.1

Panel finds that ODC has proven by clear and convincing evidence they violated Rule 4.4(a).

Even when a lawyer's communications as a whole have a legitimate substantial purpose, they can still violate Rule 4.4(a) if a part of the communication lacks a substantial purpose and has the effect of "embarrass[ing], delay[ing] or burden[ing] a person." Such parsing of communications can be difficult. *In Re Kennedy*, 503 A.2d 1198 (Del. 1985) (finding that communications between brothers violated Rule 4.4(a)).

In reviewing specific language, the Supreme Court has adopted an objective standard. *In Re Kennedy*, 503 A.2d at 1202. Courts throughout the country have also adopted an objective standard. *See, e.g., In Re Comfort*, 344 P.3d 370 (Kan. 2015). Thus, the question is not the intent of the sender, *i.e.,* whether the communication was meant to be humorous, but rather how an uninvolved individual would view the language as a whole. In addition, whether the communication had an effect on the person receiving it by influencing them to take some action they would not have taken is irrelevant.[5]

Respondent argues that his First Amendment rights to free speech limit the ability of the Court to prohibit certain speech citing *Bates v. State Bar of Arizona*

---

[5] In determining the appropriate sanction under the disciplinary rules, the fact of an injury is also not determinative. The potential for injury is what is important. *See infra.*

18

97 S.Ct. 2691 (1977). The Supreme Court of Delaware has recognized that lawyer conduct may be legitimately subject to ethical consideration when the face of first Amendment claims. *In Re Shearin*, 765 A.2d 930, 938 (Del. 2000) (citing *Gentile v. State Bar of Nevada*, 501 U.S.1030 (1992)) see also *In Re Guy* 756 A.2d 875, 878-79 (Del. 2000). The Court said in *In Re Shearin*:

> Based upon the United States Supreme Court's decision in Gentile, this Court has held that there are ethical objections imposed upon a Delaware lawyer, which qualify the lawyer's constitutional right to freedom of speech. Accordingly, members of the Delaware Bar are subject to disciplinary sanctions for speech consisting of intemperate and reckless personal attacks on the integrity of judicial officers.

265 A.2d at 938. The Panel finds these principles apply equally to violations of Rule 4.4(a) as they do to attacks on judicial officers.

There is precedent from outside of Delaware for finding Rule 4.4(a) violations based on a lawyer's sexually demeaning and racist comments. *See, e.g,* *Cruz-Aponte v. Caribbean Petroleum Corp.*, 123 F. Supp. 3d 276 (D.P.R. 2015) (attorney's sexist remark to female opposing counsel during deposition that "You're not getting menopause, I hope" violated Rule 4.4(a)); *see also Matter of Schiff,* 190 A.D.2d. 293 (N.Y. App. Div. 1993) (attorney's vulgar, obscene and sexist epithets toward female opposing counsel's anatomy and gender were inexcusable, intolerable and violated DR 1-102(A)(7) because they reflected adversely on attorney's fitness to practice law); *Mullaney v. Aude*, 730 A.2d 759 (Md. Ct. Spec. App. 1999) (male attorney sanctioned for sexist remark to female

19

deponent and addressing female attorney as "babe," during deposition); *Principe v. Assay Partners*, 586 N.Y.S.2d 182, 184-88, 191 (N.Y. 1992) (male attorney sanctioned for calling female attorney "little lady," "little mouse," and "little girl" repeatedly during deposition).

Similarly, the communications at issue rise to the objective level of embarrassing and burdening. The sexual nature of the language used with DAG 1F, DAG 3F and DAG 4F – all females much younger and less experienced than Respondent – was objectifying, degrading and demeaning. For example, suggesting in a professional writing between opposing counsel that DAG 1F's claimed near non-existent "brain wave" activity should be focused on "push[ing] up and push[ing] in" her "curves" for the excitement of the opposite sex, should reasonably be seen as denigrating her professional competence. Likewise, Respondent's remark to DAG 3F that she "stirs the 'drums of passion'" is objectifying. Blatantly propositioning her by suggesting consideration of what their "tongues can now accomplish" is beyond burdensome; it is harassing to any reasonable mind. Likewise, asserting to the Court that DAG 4F is not qualified to teach anything but yoga – an endeavor typically associated with female flexibility like other more salacious activities and involving little intellectual skills – is sexist and undermines her professional competence. It is objectively degrading. The

20

email to DAG 2M was not sexual in nature, but reasonable minds would have found it insulting and offensive.[6]

Respondent argues that he is being prosecuted based on the ODC's subjective view as to what is proper.[7] Respondent also argues that his purpose in making the remarks was to foster his clients' interests. But the existence of some legitimate purpose does not negate the applicability of Rule 4.4(a). The ODC cites cases in which a legitimate purpose was insufficient because the means used violated Rule 4.4(a). For instance *In re Moore*, 2016 WL 5886126 (Ill. Atty. Reg. Disp. Com. Sept. 9, 2016), an attorney violated Rule 4.4(a) by using derogatory, threatening and racially offensive language in telephone calls to his criminal client's father regarding payment of his fee. The Hearing Board rejected Moore's defense that he had a legitimate purpose for the calls (requesting an additional fee) and that the father had been disrespectful to him. *Id.* at 7-8 (citing *In re Gerstein*, 99 SH 1, M.R. 18377 (Nov. 26, 2002) (derogatory and insulting language in correspondence to opposing counsel); *In re Hoffman*, 08 SH 65, M.R. 24030 (Sept.

---

[6] Respondent has admitted to a Rule 4.4(a) violation as to DAG 1F and DAG 2M communications.

[7] Respondent also argues that there is no professional violation because the female DAGs said that they just brushed off the communications and went on with their work. This is factually incorrect and, even if true, legally irrelevant in light of the objective standard for liability. *See, e.g.* Tr. 99-100, 114 (indicating that DAG 1F was "offended" and kept the letter in her file but did not report it or address it with Mr. Hurley because it would not have made a difference and she predicted such complaints would be perceived as a weakness in an environment where prevailing attitudes were that "prosecutors should be able to handle" what comes at them).

21

22, 2010) (statements to another attorney about his religion); *In re Muller*, 04 CH 139, M.R. 21027 (Sept. 21, 2006) (leaving hostile telephone messages for attorney); *In re Novoselsky*, 2011PR00043, M.R. 27419 (Sept. 21, 2015) (derogatory, sexist, vulgar remarks to two opposing counsel)). "Simply because the letters contain some legitimate purpose does not negate the application of Rule 4.4. It is the Respondent's use of offensive, vulgar, and derogatory language that constitutes a violation of Rule 4.4, because the use of that language has no substantial purpose other than to embarrass or burden the recipient." *Id.* at 8-9 (citation omitted).

In *In re Comfort*, 284 Kan. 183 (Kan. 2007), an attorney violated Rule 4.4(a) when he derided opposing counsel professionally and personally in a letter he published to various members of the community. Comfort argued his substantial purpose was to get opposing counsel's attention. *Id.* at 194. Comfort's effort to shift the court's focus from his objective in adopting and pursing a particular method – to his ultimate legal objective – did not insulate him from the Court's conclusion he violated Rule 4.4(a). *Id.* at 94. Acknowledging Comfort and his client had legitimate objectives, the Court nonetheless concluded the *means* Comfort used to accomplish those objectives served no substantial purpose other than to embarrass opposing counsel. *Id.* at 194.

22

In *Florida Bar v. Buckle*, 771 So. 2d 1131 (Fl. 2000), a criminal defense attorney violated Rule 4.4(a) by contacting the victim twice by telephone and once by a letter, with various religious materials. *Id.* at 1133. The Court rejected Buckle's argument that his letter had "a" substantial purpose:

> The heart of this matter revolves around the lines of propriety involved in the conflict between zealous advocacy and ethical conduct. We must never permit a cloak of purported zealous advocacy to conceal unethical behavior.
>
> ....
>
> Certainly, the principles underlying the rules include basic fairness, respect for others, human dignity, and upholding the quality of justice. Zealous advocacy cannot be translated to mean win at all costs, and although the line may be difficult to establish, standards of good taste and professionalism must be maintained while we support and defend the role of counsel in proper advocacy. In corresponding with persons involved in legal proceedings, lawyers must be vigilant not to abuse the privilege afforded them as officers of the court. A lawyer's obligation of zealous representation should not and cannot be transformed into a vehicle intent upon harassment and intimidation.
>
> ...[B]uckle was certainly entitled and obligated to raise issues regarding [the victim's] credibility and to attempt to discover the facts and circumstances surrounding the alleged crime; however, he was not entitled to use such inquiries as a ruse for threatening, disparaging, and humiliating [the victim] into abandoning her complaint.

*Id.* at 1134 (emphasis added); *see also In re Davidson*, 99 So. 3d 18 (La. 2012) (defense attorney's statement to a police witness prior to testimony "[H]ave you ever been raped?...well get ready because today will be your first time" violated Rule 4.4(a)); *In re Mertz*, 712 N.W.2d 849 (N.D. 2006) (the existence of a

23

legitimate purpose for a attorney's communication does not shield each and every insulting, degrading, embarrassing remark contained within a communication); *In re Dvorak*, 611 N.W.2d 147 (N.D. 2000) (attorney's letter to witness's employer seeking preservation of documents served legitimate purpose, but telling employer that witness admitted testifying falsely was "independent act" violating Rule 4.4); *In re Norfleet*, 595 S.E.2d 243 (S.C. 2004) (although attorney was trying to obtain student's file for permissible use in divorce litigation, "furious" outbursts at school principal violated Rule 4.4).[8]

Following these authorities, Respondent's claimed purpose in writing the emails to the DAGs was to communicate with them concerning his clients and to do it in a way which he believed was humorous or witty is of no avail. There is no objective substantial purpose for sexually harassing opposing counsel. It is impossible to fathom a scenario in the practice of law in Delaware in which opposing counsels' lingerie and sexual relationships with her husband are relevant to the interests of clients. Advising opposing counsel she is sexually arousing is not a rational, legitimate means to fostering a client's interests. Likewise, religious slurs cannot reasonably be accepted as the "means" to serve the interests of one's clients.

---

[8] The Respondent's comments to the DAGs are different than most of the cited cases in the sense that, except for the emails to DAG 2M, they were not threatening.

24

The Supreme Court of Delaware found a violation of Rule 3.5(d), which concerns decorum when addressing the Court, when the lawyer filed briefs characterizing the opponent's case in insulting and vituperative language. *In Re Abbott*, 925 A.2d 482 (Del. 2007). Rule 3.5(d) does not contain the limitation of "no substantial purpose" but the *Abbott* case is instructive. While the purpose was to argue the case and that argument was in the briefs, the offending language used had no substantial purpose and violated Rule 3.5.

Moreover and as noted above, there is no requirement in Rule 4.4(a) that the communications have a deleterious effect on the recipient just that it objectively embarrass, delay or burden. Each of the emails at issue to the DAGs met that standard.

The emails relied upon by the ODC are different than many of the emails submitted by Respondent as "Hurleygrams." Those Hurleygrams are not sexually demeaning in nature and are not by and large religious: They are the type of banter one might expect among colleagues in a practice in which lawyers have constant contact with each other over cases which concern victims, defendants and the public in general.

With regard to Rock Peters, the Panel finds that the portion of the letters addressed to his mental state and general personality had no substantial purpose related to the reason Respondent was asked to respond to Peters complaint.

25

At the time Respondent wrote the letters he was representing himself. As such, he was subject to Rule 4.4 in dealing with others, *See, e.g., In re Kennedy*, 503 A.2d at 1202 (predecessor to Rule 4.4(a)); *Attorney Grievance Comm'n v. Allison*, 317 Md. 523, 539 (Md. Ct. App. 1989) ("[t]he intent and purpose of Rule 4.4 is served only by the construction that a lawyer is representing a client when he represents himself, and we adopt that common sense construction"). Respondent asserts that because Peters defamed him and accused him of sexual perversion that he needed to vigorously defend himself in the strongest words. While the communication arguably had a substantial overall purpose, the Panel finds that the specific language used had no substantial purpose and violated Rule 4.4(a). Mr. Peters did not testify at the hearing and the reason he did not appear was not explained.

## IV.   RULE 8.4(d) ANALSYSIS AS TO BOARD CASE NO. 113087-B

Rule 8.4(d) states "[i]t is professional misconduct for a lawyer to engage in conduct prejudicial to the administration of justice." The comments to the Rule specifically reference racially and sexual motivated behavior that have an effect on the administration of justice:

> [3] A lawyer who, in the course of representing a client, knowingly manifests by words by words or conduct, bias or prejudice based upon race, sex, religion, national original, disability, age, sexual orientation or socioeconomic status, violates paragraph (d) when such actions are prejudicial to the administration of justice. Legitimate advocacy respecting the foregoing factors does not violate paragraph (d). A trial

26

judge's finding that peremptory challenges were exercised on a discriminatory basis does not alone establish a violation of this rule. Rule 8.4(d), Cmt. [3]

None of the communications at issue are, or claimed to be, part of any genuine legitimate advocacy within the scope of the comment above.

The precedent regarding the parameters of Rule 8.4(d), however, focus on violations involving some burden imposed upon the Court or the formal judicial process. In *In re Abbott*, 925 A.2d 428 (Del. 2007), the Court found language in opening and reply briefs violated Rule 3.5(d) (conduct which is undignified or discourteous to the Court) and 8.4(d). Because the Supreme Court found that the Superior Court was burdened by the pleadings, the filings violated Rule 8.4(d).[9]

The emails to DAG 1F, DAG 2M and DAG 3F were private and to the recipient alone.[10] The emails would have been retained in the DOJ electronic files for each case. None of the DAGs who testified indicated that any of the cases were

---

[9] Other cases involving Rule 8.4(d) are *In Re Martin* 105 A.3d 967 (Del. 2014) (finding a violation of Rule 8.4(d) by attorney who violated a Supreme Court Order and assisting another lawyer who was suspended to engage in the unauthorized practice of law), *In Re Tos*, 576 A.2d 607 (Del. 1990) (knowing violations of court obligations violate Rule 8.4(d)) and *In Re Shearin* 765 A.2d 930 (Del. 2000) (filing of patently frivolous litigation was a violation of Rule 8.4(d)).

[10] While the ODC cites some authority for the proposition that vitriolic, *private* communications could be prejudicial to the administration of justice, those cases involve the attorney using such means to gain strategic advantage. *See, e.g., In re White*, 707 S.E.2d 211 (S.C.), *reinstatement granted*, 707 S.E.2d 436, (S.C. 2011). The ODC posits that Respondent's statements were "calculated litigation tactics" designed to produce plea offers (OB at 35). There is no clear and convincing evidence to support this claim as to the statements at issue (*see, e.g.,* Tr. 107 (indicating that the Valentine's Memo did not affect the resolution of the Houghton matter)).

27

affected by the emails. Because of the private nature of the communication and lack of any direct impact on the administration of justice, the Panel finds the communications to DAG 1F, DAG 2M and DAG 3F do not violate Rule 8.4(d).

With respect to the email (Ex. J), which was sent to the Superior Court and DAG 4F, the Panel finds that it violated Rule 8.4(d). It is a matter of public record and while there was no testimony that it disrupted the Court, it was imposed upon the Court.

## V. THE PRESUMPTIVE SANCTION

Attorney discipline is not intended to be punitive. *In re Koyste*, 111 A.3d 581 (Del. 2015). Rather, the objectives of the Lawyer Disciplinary System are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar conduct. *In re Fountain*, 878 A.2d 1167, 1173 (Del. 2005). To "further these objectives and 'to promote consistency and predictability in the imposition of disciplinary sanctions,'" the Supreme Court looks for guidance to the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards"). *See id.* (citation omitted).

### A. ABA Standards

The Court is generally guided by the ABA Standards and relevant Delaware precedent when making an initial determination of an appropriate or presumptive sanction after finding attorney misconduct. The ABA Standards set out a four-

28

factor test: (1) the ethical duty violated; (2) the lawyer's mental state; (3) the extent of the actual or potential injury caused by the lawyer's misconduct; and (4) aggravating and mitigating factors. The first three factors lead to a preliminary determination of the appropriate sanction. The fourth factor – relevant aggravating and mitigating circumstances – may be considered in determining whether an increase or decrease in the presumptive sanction is warranted. ABA Standard 3.0.

1.     Duties Owed to the Legal System and the Legal Profession

Violations of Rules 4.4(a) and 8.4(d) involve breaches of duties owed to the legal system and the legal profession. The ABA Standards that appear to most clearly address the conduct for a violation of Rule 4.4(a) is ABA Standard 6.33. The ODC relies on ABA Standard 7.2. Both are relevant. ABA Standard 7.2 addresses breaches of a legal duty owed to the profession and "conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to ... the public, or the legal system."

The Delaware Supreme Court "takes very seriously a lawyer's fundamental duty to foster public confidence in our Bar and to maintain the integrity of the legal profession." *In re Howard*, 765 A.2d 39, 46 (Del. 2000). When attorneys engage in harassing and discriminatory behavior "they do not merely reflect on their own lack of professionalism but they disgrace the entire legal profession and the system of

29

justice that provides a stage for such oppressive actors." *Mullaney*, 126 Md. App. at 654; *see also Assay*, 586 N.Y. S.2d at 185 ("discriminatory conduct on the part of an attorney is inherently adverse to the goals of justice and the legal profession") Respondent admitted his conduct with respect to DAG 1F and DAG 2M violated Rule 4.4(a) and the Panel finds by clear and convincing evidence that Respondent's communications to Mr. Peters and the DAGs, collectively violated Rule 4.4(a). It further finds that the communication to the Superior Court and DAG 4F also violated Rule 8.4(d).

### 2. Respondent Acted Negligently

The Panel finds that with respect to his communications to Peters and to the DAGs, Respondent acted negligently. While he knew what he was writing, he did not act with a conscious awareness of the nature of the attendant circumstances. Respondent has engaged in ribald and other topics of humor over the years. He had no conscious awareness that the conduct would violate the Rules. Although Respondent admitted a violation of Rule 4.4(a) with respect to two DAGs, those admissions came about because of his realization that the recipient was upset and offended by the communication.

### 3. Injury

In determining an appropriate sanction the Court looks at whether Respondent's conduct caused injury. The injury may be actual or simply potential.

30

Here, the Deputies were actually harmed in the sense that they were upset by the communications. While no Deputy testified that there was an actual effect on a particular case, the impact of the communications sent had the potential for an injurious impact.

There was no testimony as to the actual impact on Mr. Peters of the communications. But actual injury is not required. The correspondence may have the potential to persuade improperly Mr. Peters not to proceed with the complaint which for injury is sufficient.

4.    Aggravating and Mitigating Factors

    a.    Aggravating Factors ABA Standards 9.22

The ODC argued 5 aggravating factors:

1. Previous sanction. In 1990 Respondent was sanctioned by the Supreme Court for Respondent's perceived disrespect for the Court when he filed an additional pleading on behalf of a client after he had been directed by the Court not to file any additional pleadings. *In Re Hurley*, 583 A.2d 660 (Del. 1990). Also, on July 10, 2013, Respondent consented to the imposition of private probation for a violation of Rules 1.15(a) and 1.15(f). ODC said that the violation regarding DAG 2M occurred during the period of probation. The length or terms of the probation were not specified. The Panel notes

31

that the first sanction was 15 years ago and that the second was of a completely different nature than the current case.

2. Pattern of misconduct. ODC argues that the allegations with respect to Mr. Peters and DAG 2M (which involves insulting language) are a pattern since they involve the same sort of conduct. Likewise, ODC asserts that the sexual references in multiple emails constitute a pattern.

3. Multiple Offenses. ODC argues that all of the communications to Mr. Peters and the DAGs together constitute multiple offenses. The Panel in considering the penalty recommendation took into account the number of communications as well as past warnings of the DOJ to Respondent about his communications certain DAGs.

4. Substantial experience in the practice of law. The Respondent has substantial experience as he was admitted to the practice of law in 1970.

b.     Mitigating Factors ABA Standard 9.32

The following mitigating factors were presented:

1. Absent of a dishonest or selfish motive. There was no dishonest or selfish motive with respect to the communication with the DAGs. Respondent believed he was representing his clients.

32

2. Cooperation with ODC. By all accounts Respondent cooperated fully with the investigation and subsequent hearing.

3. Remorse. While Respondent was remorseful that he had hurt a DAG's feelings or embarrassed them, with respect to Mr. Peters, Respondent believed his letters were fully justified.

4. Character or Reputation. A number of prominent attorneys provided letters to the Panel testify to Respondent's good character, integrity and service of profession. None of the letters made reference to the individual communications at issue.

## VI.   RECOMMENDED PENALTY

ODC recommended that Respondent be publically reprimanded. While ODC acknowledged that a more severe penalty was possible, it made no such recommendation or argument. Respondent, other than presenting certain mitigating factors, made no particular suggestion with respect to a penalty, leaving it to the Panel.

The Panel finds the language used in the communications at issue to be degrading and demeaning to the recipients based on their gender, religion and national origin, and objectively to have the purpose of embarrassing or burdening. Such language has no part in the practice of law even in private communications among lawyers. Although the Respondent has a history of sending so called

33

"Hurleygrams," which many recipients found humorous and in fact looked forward to receiving, the communications presented to the Panel by ODC crossed the line and violated Rule 4.4(a). A public reprimand as opposed to a private reprimand has a greater likelihood of curtailing Respondent's future conduct. Further, a public reprimand insures that future recipients of similar remarks, whether from Respondent or others, will be aware that they can and should speak out.

In addition to a public reprimand, the Panel recommends that, within 6 months, Respondent certify to ODC that he has successfully completed a training program to be provided by an experienced Human Resources professional on the subjects of professionalism, respectful treatment of colleagues and opposing counsel, and the need to refrain generally from discussions of a sexual or religious nature when communicating, verbally or in writing, in the course of practicing law. The Panel also recommends that Respondent bear the cost of such training, which shall be provided by a qualified professional chosen by ODC. It is also recommended that Respondent pay the costs associated with the investigation of this matter by ODC.

IMPAC 5395218v.1

_____
Daniel F. Wolcott, Jr., Esquire
Chair


_____
Deborah L. Miller, Ph.D.


_____
Jessica Zeldin, Esquire


Dated: _September 19, 2017_____

Daniel F. Wolcott, Jr., Esquire
Chair

Deborah L. Miller, Ph.D.

Jessica Zeldin, Esquire

Dated: _____

_____
Daniel F. Wolcott, Jr., Esquire
Chair


_____
Deborah L. Miller, Ph.D.


_____
Jessica Zeldin, Esquire


Dated: _____